Good afternoon. Illinois Appellate Court, 1st District Court is now in session. The First Division, the Honorable Justice Aurelia Puchinsky presiding. Case number 20-1292, Nanabola Law Group, P.C. v. Michael Cogan. Good afternoon, everyone. I am Justice Aurelia Puchinsky. On your screens, you'll see with me, Justice Michael Hyman, Justice Mary Ellen Coughlin. We'll be hearing this case via Zoom, but we do it basically the same way we do it in court. Everybody gets their time. If we interrupt you, please try to answer the question. We hope that we don't get you too far off track on what your thought pattern might be. And with that, I'd like to ask the counsel to please introduce yourself. Counsel for the appellant, please. Good afternoon, Justices. Edward Feldman for Yes, we can. Thank you very much for asking. And counsel for the appellee. Good afternoon. This is Jim Filio, appearing on behalf of the appellees. Okay. Can you hear me okay? Yes, we can. Thank you. All right. Mr. Feldman, you're going to give us your opening statement, and then you're going to reserve a couple minutes for rebuttal. I take it. Yes, please. Okay. So please begin. Thank you. And may it please the trial judge erroneously entered summary judgment in this case. What Kogan and Power did was wrong and violated fiduciary duties that they owed to the Kogan and McNaball firm. A jury should hear the issues of fact, which will prove that Kogan and Power committed a host of fiduciary duty violations as set out in the doubt and doubt opinions. In fact, Kogan and Power checked every doubt and doubt box of fiduciary violations. Those boxes are in some don't solicit. Don't lie or deceive. Don't use firm resources. We've read the briefs, the record. So we're very familiar with your contentious. I'd like to ask a preliminary question, and that is why we should not strike your opening brief. Oh, Justice Hyman is frozen. Give him a minute to unfreeze. You're better. Okay. He was not frozen. He was not frozen to me. I heard the question. Justice, you were done with the question. No, no, I wasn't. So your opening brief is 60 pages. The rule 341, as you know, is 50 pages. I checked, and the reason I asked the question is I checked the docket. I didn't see a motion for leave to file a brief in excess of 50 pages. Did I miss something? No, you didn't miss something, but we complied with the rule because we complied with the word limit alternative limitation. So we used, as you might have seen, we used a century school book font, which is easier on the eyes. And we went with the word count limit, and we have a certification required by the rule that we were under the, and I don't remember what the word limitation off the top of my head is. I think it's 15,000 or something like that. And we complied with the word limitation and so certified it. Okay. I did not count the words in your brief. Well, we relied on Microsoft Word to tell us how many words there were. Okay. Thank you. So my next question is, you make several arguments as to why we should reverse. And not all of them, I would assume, are of equal strength, but if there was one argument that really hits the ball out of the park, I mean, this is the argument of all the arguments. It's not all of them. So there has to be one that, look, you can't win this one. It's going to be tougher. Not saying it's out of the, you can't do it. It's tougher. What is that argument? And why is that the one? I'm going to answer your question, Justice Hyman, but your question does remind me of asking me to pick which of my children is my favorite. And it's hard for me to do. But I think the client solicitation evidence is the strongest. I mean, I believe the others are very strong as well. But we have, in the case of Ms. Begum, a sworn affidavit of a client of the Kogan and Power firm whom John Power called two weeks before leaving the firm at a time when he and Kogan, with the assistance of firm paralegal Greg Marshall, who did all the legwork for them, had set up their new firm, had taken out the line of credit, paid the first month rent, gotten insurance, gotten email and letterhead, everything set up. And Power calls Ms. Begum. And contrary to what Dowd once says, he doesn't present to her. First of all, he does it before leaving. And then he says, your case is coming with me, in essence. And he disparages the existing firm, calling them dishonest. And he basically presents it to her as a fait accompli. That is just an absolutely clear textbook violation of the anti-solicitation rule that's set forth in both Dowd opinions. Similarly, with respect to IULA, the... Excuse me. Can I just ask you, regarding the Begum affidavit, Post and Compton makes the argument that that was waived, that it wasn't raised in the trial court. Was it raised in the trial court? Oh, it absolutely was. The Begum affidavit was raised in the trial court. It was presented to the motion for summary judgment and relied on and argued in the brief in response to the summary judgment motion. It absolutely was presented as a textbook example of client solicitation. And with respect to the IULA case, here you have the... Before we get to IULA, with regard to Begum, didn't she state that Parra told her that she would need to sign something to transfer her case? And that transfer form wasn't signed until July 5th? Those two facts are true. That was part of what he said, that she would need to sign something. It wasn't presented in the way that Dowd says it should be signed and other authorities say which is, you have a choice, Ms. Begum. You can either keep your case at the old firm, or you can move it to the new firm, or you can pick your own counsel. It was presented as a fait accompli. I'm going, I worked on your case. You need to sign this. And sure, they waited until after they're out the door to present the document. They papered it in an appropriate way. But the oral conversation, the solicitation happened around the middle of IULA, and they were soliciting the Mosfine opportunity, all happening at approximately the same time. And the trial judge respectfully read the Begum affidavit in the light most favorable to the defendants, but that's not the proper role of the trial judge on summary judgment. All reasonable inferences must go in favor of the non-movement here, the McNabola Law Group. And the trial judge read it as well. It was just the musings, and he was just kind of talking, but it really wasn't solicitation. And Mr. Filio, I'm sure, will make a very compelling argument to the jury that that's what Ms. Begum's testimony means. But we'll be entitled to make an equally and we think more compelling argument to the jury that, come on, let's get real here. We know what was going on here. Can I ask a question? What were your damages with respect to Begum? So the damages could fall into two categories. One is the, as we set forth in the brief, if solicitation occurred, as we believe the evidence, we're entitled to get to a jury, the evidence from Ms. Begum's affidavit, which is uncontradicted, establishes solicitation, then we're entitled to, McNabola Law Group is entitled to damages under the disloyal fiduciary doctrine, which was applied actually in the Dowd 2 opinion, this court's opinion after remand from the Supreme Court, but in several other opinions that are cited in the briefs. So that's one element of damage. What the trial judge also said is, well, Ms. Begum fired Power four or five months after the case went over to the new firm. And so they didn't get a fee out of that. And that is correct that they didn't get a fee, but they deprived the McNabola Law Group by taking the case away from them, not giving her the opportunity to stay there. The McNabola Law Group might've had the opportunity to keep the case and get an ultimate recovery on the case. So they were deprived of that opportunity to get the recovery, whatever recovery she got with whoever law firm she went to after firing Power. Does that sound a bit speculative to you? Well, it would not be the latter part. If she got a recovery after firing Power, then that would be a discoverable fact that we wouldn't have any speculation on. No, I think we're all wondering why you're speculating that if she fired Power that other people probably did too. No, if I said that I misspoke Justice Kuczynski. No, she did fire Power. That's undisputed some four or five months after the case moved over to the Kogan and Power firm. Okay. But then you also say there's something about a reasonable inference. Did you infer that Power had contacted other firm clients whom he represented? Yes. Well, there's both direct evidence of that and reasonable inferences of that. So we- Okay. So if we just limited it to the direct evidence that you're presenting, whether we agree with it or not. I mean, looking at reasonable inferences, I'm not entirely sure how we get there. So I'm not exactly sure I'm following your question, Justice Kuczynski, but if I can set forth, we have direct evidence with respect to Ms. Begum in the form of her affidavit. We have direct evidence with respect to the Mosfine opportunity in the form of the contacts that were admitted and are documented from an email and from the fine law lead that set forth in the brief. Direct evidence that Power had substantive conversations with Ms. Mosfine in June at about the same time he was talking to the other clients who were talking about how valuable the case was and that it was a very valuable potential case. So there's direct evidence in that situation of pre-termination, pre-resignation solicitation of a prospective client. And in that situation, it's very important that Power and Kogan had not previously disclosed any of their intentions to leave. And in fact, Power had lied under oath in the arbitration that happened about six or seven months earlier. He had asked directly in the arbitration, have you ever had any discussions with Kogan about leaving the firm? And he said, no, I have not. And that was a falsehood. And it's undisputed, that's a falsehood in this case, because- I think we're getting off the point. Well, I'd like to follow up on Justice Kogan's question. When she asked you about, or maybe it was Justice Kuczynski, but the question had to do with the waiver. And the argument that is made by the defendants is not as you stated. The argument that they made is that, of course, below the affidavit was there and the judge considered it. That's not the issue. Their argument is that for the first time on appeal, you say you are entitled to recover, I guess, a disloyal fiduciary. And that's why it's forfeiture. Yeah. And answer why you disagree with that. I assume you do. And let me give you a citation. Let me just find it to answer that question because it is not waived. And in particular, the disloyal fiduciary argument was raised expressly, the damage theory was raised expressly in the complaint itself. It was raised in the answers to interrogatories that that was an item of potential damage. And there's a section of the brief in response to summary judgment blow, raising disloyal fiduciary damages as an element of damages. So, in particular, paragraph 30E of the second amended complaint, paragraph 37B, the damages prayer includes the disgorgement. And I'll quote, disgorgement by some or all the monies paid to Kogan and Power by MLG, while Kogan and Power were breaching their duties to the firm. So, that is in the complaint. And in the brief below, and this is pages 34 to 36 of the response brief below, and this is at CS, the sealed portion of the record 1055 to 1057, the argument was raised that the breaches of fiduciary duty entitled damages under the disloyal fiduciary doctrine. So, we disagree that there's any waiver of that particular line item of damages. Okay. Well, according to their argument, they are saying that the waiver is to the extent that you were asking for John Power's salary and punitive damages. So, with respect to Mr. Power specifically, a couple points on that. One, it was pleaded in the complaint that Power, disgorgement from Power, is an item of damages. And they raised the argument below with respect to Kogan. And we replied below with respect to their argument on Kogan, they didn't raise that argument with respect to Power. In any event, as we say in the brief, on that particular item of damages, and it is pleaded in the complaint, if we can obviously ask the court to amend the interrogatory answer to add that item there. But it was pleaded in the complaint as an item of damages with respect to Mr. Power. Punitive damages? Well, punitive damages and disgorgement were both. And punitive damages against Power was raised in the interrogatory answers. And disgorgement as set forth in the Common versus Timber Court opinion of a year or two ago, is one species of punitive damages, it can be considered a species set forth in that opinion by Justice Gordon. So I hope that answered your question. Both of you justices who asked that question. So I was about to talk a bit about the IULA solicitation, because using the metaphor I used before, it's one of the children I'm very fond of, in terms of strongest arguments. And here, and this addresses your question, Justice Paczynski, about inferences. And I'd like to preface this by saying, in the Dowd and Dowd opinions, actually, both the Supreme Court opinion, then after remand and trial, and then back to this order to find that the partners who departed in the Dowd cases had breached fiduciary duties. So here we have very compelling evidence in the form of the phone call logs. And these have to be considered in the context of everything that was going on at the time with respect to the firm being set up to go into business, and the other solicitations that were happening at the same time. And so I direct the court to the charts in our brief at pages 13 to 14. And a jury should be allowed to ask, answer this question. Why were Power, Kogan, and Papin calling each other back and forth, back and forth, and back and forth, like middle school kids, between 9 and 11pm the night before the IULA mediation that was being conducted before retired Judge Donald O'Connell? When Power and Kogan had no role in the IULA case, Papin was not working for them on any cases. Yet Power is calling Kogan, and then Power immediately calls Papin, Papin hangs up with Power and immediately calls IULA, and then hangs up with the IULA and immediately calls Power back, and Power immediately calls Kogan back, and back and forth, and back and forth for 95 minutes on a Wednesday night in early June. Now people can lie, people can forget, but these phone records do not. Juries decide this is the type of inference, this is the type of evidence that a jury gets to decide who is telling the truth. But you don't have, but what, but we have no evidence other than the speculation with regard to what was the discussion, right? No, you have nothing to say that they discussed what you say they discussed. That is pure speculation. Don't you have an obligation at the summary judgment stage to say, yeah, there was a discussion about, just to say, well, they could have been talking about the case being up in arbitration the and just because somebody's not on it, law firms, lawyers talk to one another all the time about cases that they may not be involved in, in connection with an ongoing matter that's about to go to our hearing. I disagree. I don't believe this is speculation at all. And what's interspersed in here is not just lawyers talking to each other. Bear in mind, these are lawyers who aren't working on any cases together. But interspersed with that is Papin calling the client, IULA, in that same chain of phone calls. He's hanging up with Papin power, immediately calling IULA, immediately calling power back. And then he's calling IULA another time during that phone call chain. And there's no explanation for this. There's no believable story about this other than- Well, there is an explanation. You clearly don't believe it, but didn't the paralegal testify at the deposition that her conversation with IULA had everything to do with the mediation? Yes, but IULA was not doing- I'm sorry, with Papin? Am I pronouncing that correctly? She did testify to that. She is a good friend of Papin, but she- Okay, so that's- She was not involved in the actual phone calls between the partners. My point is that you're not only speculating as to what you think these phone calls consisted of, but you're also disregarding evidence to the contrary that's in the record, which we can't do. I'm not saying, Judge, that- Justice, that that is evidence to disregard. That is evidence for the defendant to present to a jury against this phone call log evidence. I guess my question is this. What concrete evidence do you have other than speculation? Because there is evidence in the record to suggest the contrary. Do you have anything other than you strongly suspect that all these conversations are going on? I would say there is no evidence in the record to suggest the contrary, none. There's no testimony from IULA suggesting the contrary. Kogan and Power do not deny what was said in those conversations. They claim not to remember what was said in those conversations. They have no explanation. But you have no- You have nothing on the contrary. I mean, it's your burden. I mean, you have a burden here, too, to come forward with something other than a list of phone calls. And all we have right now is a document that can't be cross-examined. And you've already examined the parties involved. And you came up empty-handed, except to say, well, they had to. They had to be lying. They had to be scheming. I mean, that's your argument. But there is nothing that you were able to turn up that gives you something other than to say pure conjecture. What did I miss? This is no different than the furniture label evidence in the Dowd case. One of the issues in the Dowd case was solicitation of attorney employees to leave. And everybody is denying up and down that any of that solicitation happened. But what was presented was furniture labels that had names of lawyers, pre-printed furniture labels, dated before the date of departure, with the lawyers' names on it. And the court found the trial court- This is not even- That was enough to create an inference. You're not going to get anywhere with us comparing that with Dowd on this issue. I mean, at least not with me. Because to me, Dowd is a much different case with regard to that issue. Okay? That doesn't- I can't see similarity at all on that. So do you have anything else besides that? Well, on the IULA matter, I'll just refer the court to the briefs with respect to further development of the evidence on IULA. But I would like to speak briefly about the Mosfine matter. I'm not sure where I am on the time. But if I can address- Well, if we could get there quickly, that would be good. All right. Thank you, Justice Kuczynski. So Mosfine was a very lucrative lead that Power cultivated and developed in his last couple weeks at the firm. And the reason he got it was it was his turn in the rotation to field leads from the Ferdinand Feinblau subscription. And he and Power, he and Kogan had not disclosed to the firm that they had been planning for a long time to leave and that they'd already set up their new firm. Had they made that disclosure, there's no way that they would have been- Power would have been left in charge of fielding prospective leads for the firm. He should have. I'm very sorry, but didn't Mr. McNabal know what was going on in his firm? Didn't he know who was assigned to Feinblau on that date? He did. He did, but he didn't know Power was heading out the door in two weeks. And Power had lied six months earlier in the deposition about- I'm sorry. I didn't mean to interrupt. You were asking? Go ahead. Okay. Power had falsely testified in the arbitration that he hadn't had any conversations with Kogan about leaving. And that's a textbook fiduciary breach, what he did. You can't decide to leave your employer and set up all your plans to leave your employer and continue to- And we didn't have any further contact with her. She called once. She called once. She said, I'm thinking about it. Then nobody talked to her again for a couple months. So it wasn't like he was cultivating this client. He answered a law-finding thing. He had a detailed substantive- He met with her in person, had a detailed substantive conversation with her, found out about what appeared to be a botched triple aneurysm repair that resulted in 13 hours of surgery and a patient lying in a coma. He admitted in his deposition it looked like a potentially lucrative case. And then he kept it on ice until he was out the door. But you have to disclose that. That's a corporate opportunity. You disclose to your- I think the facts established that she kept it on ice. She was trying to decide what to do. Well, ultimately, of course, the client- It's always the client's decision what to do. The client just never got back to him. Under the corporate opportunity cases, it's very clear that an employee or an officer has a duty to disclose the corporate opportunity to the firm and the duty not to use firm resources to field the opportunity. And power violated both aspects of that duty, quite clearly. How clear that is. But that can be debated. But I have one last question. The attorneys on both sides of this case, on the briefs, are among the best attorneys in the city, all of you. Thank you. But I have to take- I was questioning your footnote, too, in your reply. And I'll tell you why I'm troubled by it. You say defendants also seek to distract from the mayors by personally attacking Mark. And then you say, e.g., defendant brief two through eight. Their attacks are untrue and irrelevant to defendants' fiduciary breaches. Now, those seven pages, I read them twice to make sure. And every single line is referred to back to the record. And I looked at the record, too. And you refer to the record sometimes at the same pages. But I didn't see- and tell me, you didn't give one example where they seek to distract from the mayor by personally attacking Mark. You can think that they were attacking Mark because of what was said in the depositions or that in the record. But to say that, I'm just- what concerned me was that you didn't give one example of the seven pages, and I didn't see one. Am I missing something? I think maybe in that footnote, we weren't maybe as clear as we should have been. I don't think we were saying in that footnote that they were being dishonest in their presentation of the facts. No, but personally attacking, you know, we don't personally attack people. And you're all civil, you know, good, good lawyers, okay? And I'm not accusing you. I'm just saying, but when I read that kind of footnote, it concerns me because we don't want to see instability in briefs. And you say, not talking about the mayor, but a personal attack on Mark. And I'm just trying to- I read it. What did I miss? Let me tell you what I meant to convey, and maybe I didn't do a good job of it. What I meant to convey is that that section of their brief is- basically tries to portray Mark as a bad guy who is dictating unfair terms to Kogan, okay? That's sort of a- and Mark has a counter story that Kogan was not carrying his weight at the firm, and he was fairly compensated. That's a partnership dispute. Both of them are accusing each other of bad things. The point that I'd like to leave you with, Justice Hyman and Justice Cogman and Puchinsky, is this. Whether or not Kogan was treating Mark well, or Mark was treating Kogan well, whether the compensation was fair or unfair, whether someone was mean or not mean, is really irrelevant to the issues before the court. Because the duties- fiduciary duties set out in the Dowd opinions apply no matter what. No one who's a happy camper leaves the law firm. They're dissatisfied to some extent, sometimes very dissatisfied and very disgruntled and angry. But Dowd and Dowd don't set out one set of fiduciary duties for the happy departing partners, and another set of fiduciary duties for the unhappy departing partners. There's one set of rules, and whether you're happy or unhappy, whether you think you've been treated well or treated poorly, you have to leave in the proper manner. You can't solicit. You can't deceive. You can't lie. You can't, like Mr. Marshall, bring in a paralegal under false pretenses to go on the payroll and then act as your wingman to set up a new firm. And with that, Justice Hyman, I hope I've answered your question. I apologize if I missed that footnote, and I'll reserve my remaining time for rebuttal. Thank you for listening. Thank you. Mr. Gioia. May it please the court. I represent Kogan and Power, Michael Kogan, John Power, and Greg Marshall. I listened to the argument. I think the case in many of these cases, the law firm where lawyers withdraw or resign or are terminated from a law firm and what happens, the issues focus on, as I think counsel recognized, whether there's pre-termination or pre-resignation of clients, solicitation of clients while they're still partners or employed at the subject firm. And there really is a complete absence of evidence. And this is not an early... I'd like to interrupt you there because you say complete, which is a word like being, very clearly or something. There is the Begum affidavit. Right. So I don't think it's complete. And the Begum affidavit seems to contradict what you just said. Well, it's totally consistent with the testimony that my clients have provided, their answers to interrogatories where they expressly deny ever having any... I'm going to add a question of fact. Okay. We got a question of fact here. Begum's affidavit says one thing. Your clients say another thing. It's an issue, a lot of money involved in that claim. Why don't we reverse? Well, there is not a lot of money or really any money or any claim for damages involved in the Begum case. The Begum case very clearly in their answers to interrogatories, they don't identify the Begum case as having any damage. In fact, they supplied in answers to interrogatories a list of cases where there were fees claimed as damages. And Begum is one of the cases and it has zero, it has nothing for fees in either of those cases. And it is, if you look at Ms. Begum's affidavit, it's clear that she was disgruntled and she left. And there's no documentary evidence, no corroborating evidence at all of any communications with John Power before he resigned, but she does say it. So we accept it, but that's not evidence of anything else. Your argument is there's no damages. There was a conversation in June, according to her affidavit. So there wouldn't necessarily be any documents. The word complete is probably an overstatement in light of the Begum affidavit, but it still doesn't rise to the level of a reason to reverse the summary judgment where the focus of the case is on 34, 35, or 36 other clients, none of whom have provided any evidence, nor is there any evidence in the record. And I'll use the word complete in this context, a complete lack of any factual basis to suggest that there was any pre-resignation, termination of any of those clients. The clients, some of them in the context of opposing the summary judgment, some of them in the context of underlying quantum Merowith cases, John Power and Mike Kogan have provided testimony, including their answers to interrogatories, where they have stated they had no communications with, uh, with clients that, uh, that would, uh, predate the, the resignations, the, uh, the particular, uh, citation to the record for the answers to interrogatories, which is C-2366, where they say further answering defendants had no communications with quote, McNabola firm clients, end quote, regarding potential legal representation by Kogan and Power prior to defendants resignations and departures from the McNabola firm on July 2nd, 2012 at 8 58 AM. End quote. That's in addition to John Power's testimony. It's in addition to the answer to the complaint, the denial and the answer to the complaint. And it's in addition to all of the affidavits from the clients, the only thing that they have left is, uh, the telephone records that we talked about. Um, and, uh, you know, they're, their response to that constitutes, uh, circumstantial evidence of solicitation. Uh, the records fall outside the scope of the RTA responses because they merely show date and times, but not content. So they're saying, you know, they should have an opportunity to have a trial and show the, I guess the content. What's your response to that? I have a couple of responses. One, it's not enough to even raise a reasonable inference of pre-termination solicitation. Two, if, you know, they're in this little bit of a bind, I think they say that these telephone records, uh, are evidence of, uh, of pre-termination solicitation. Yet when they admit that they have no documents that would show a solicitation, they, these phone records they have. So they're, they're, for purposes of responding to discovery, it's not, you know, their, their answer is not binding on them because it's not evidence of solicitation. Yet here they're saying it is, but more importantly, telephone records alone in a context where, uh, John Pappin had been handling the EULA case for Mark, uh, McNabola in his group and had been told not to attend the mediation. And then there was a series of conversations in, in essence, what should I do? And, uh, uh, I think Ms. O'Keefe, uh, explained the context of that and what was going on there. That's a totally, uh, reasonable, understandable inference. It has nothing to do with pre-termination solicitation. And I do want to remember, remind the court that, uh, there's a summary judgment that's been entered in favor of the defendants against the plaintiffs for any claim for damages relating to, uh, the EULA matter that's been already done. The only thing that remains is whether it is, uh, circumstantial evidence of proving a pattern of conduct with respect to all of the other clients where there's absolutely no hint of pre-termination solicitation. And it clearly is, does not serve that purpose. Mr. Pappin is not involved in any of these other cases. There is no comparison. All of the other cases too are, are the ones that are at issue here are John Powers cases, cases where he was the originating attorney. He was the one who handled it. He was the one who had the relationship with the clients. That's not anything like EULA. EULA was, uh, Mark McNapola was the originating attorney. Pappin handled it for him. And that is totally different from what happened with respect to all of the other clients. Okay. Let's go to the third item, which is the emails regarding Muscovine opportunity. And as to that, they say that you even acknowledge that the documents that MLG has cited is reported evidence of preregistration solicitation do not contain any evidence of tacitly conceding that he fall outside the admission. So somehow that raises an issue. And it does fall outside the admission because Muscovine was not a client and our requests focused on clients, which is also a reason why it's not evidence of pre-termination solicitation of clients because she's not a client. Moreover, the facts there are pretty well laid out in the an important part and part on the forfeiture waiver side of it, uh, this usurpation of a corporate opportunity, corporate opportunities, your honor. So he have, they have certain elements and requirements to meet. I don't think it satisfies any of them, but it was never raised as a claim. It was raised in the context of, uh, evidence of pre-termination solicitation of clients or even potential clients, but not in the context of a usurpation of a corporate or business opportunity that it wouldn't qualify as that, nor was it alleged or argued as that until we get on appeal. So I think that's, you know, that takes Muscovine really off of the clients. It bears no resemblance to it. It's a different circumstance. It wasn't any communication with the client before they left. And the evidence suggests that the daughter was weighing her choices and was thinking about what to do and what to do. And she didn't follow up with, uh, until months later, nor did he with her. So there was no real potential there, uh, other than an exploratory conversation of which I suspect there's probably many of different kinds every day, some of which rise to a level of, of, uh, a real opportunity where you open a file and you do something and others, which don't. And so there's really, Muscovine is really a separate matter. And to the extent they argue it's an usurpation of a corporate opportunity was not argued. It was not presented that way in the, in the trial court. And I wanted to touch base briefly on the forfeiture of compensation for John power. There is no, that is not in this case and answers to and they did talk about discouragement, but it was of Kogan. It's a discouragement of Kogan compensation beginning from the breach of fiduciary duty, et cetera, nothing about power, no argument below that power forfeited is, is compensation. So we have of a whole lot of things going on here. Three matters that they rely on, none of which are sufficient to give rise to an inference that 34 or 35 or 36 other clients, all of whom denied pre-termination solicitation, all of whom Kogan and power have denied pre-termination solicitation. And none of which have any evidence, any evidence of pre-termination solicitation or wrongful conduct. This, this case is really we, you know, who, who knows what motivates people to file lawsuits, but this case does not have evidence to support a claim for breach of fiduciary duty against John power or Michael Kogan based on the evidence that was presented at its court. They left in July 1st, 2012, the law or July 2nd, 2012. They, the suit was filed July 1st, 2014 years past the very aggressive discovery production of tons of materials, a very scorched earth approach to the discovery, which was fine. And that was done. And then we moved for summary judgment, judge Bastia carefully reviewed the record, heard arguments, looked at the evidence. It wrote a really, it's still a no vote of review. So, you know, right, right, right. So is there anything else you want? You're kind of repeating that. I, I, I am. I, my, our basic position is that none of this evidence that they purport to have would support a reasonable inference that there was a breach of fiduciary duty for pre-termination solicitation of clients or inducement of anybody to leave with them, that the evidence is just not there. And these three particular matters, none of them rise to a level of a separate claim or a claim that would, and most importantly, I think in this case, provide evidence of solicitation of others. And I'd be happy to answer any questions. Otherwise I'd rely on our briefs and, and can ask the court to affirm. Thank you. Any questions? Mr. Feldman, quickly, please. Thank you, Justice Pachinski. Mr. Filio mentioned toward the end that with respect to the other clients who submitted affidavits, that all of them denied pre-termination solicitation, as set forth in our briefs, that's not accurate. 11 of those affiants, and we have to assume that Power and or Kogan drafted these affidavits for their clients to sign. 11 of them were silent on that very critical point. And we think that is important when considered in the context of the Mosvine solicitation, as well as the Kagan solicitation. And the, how do we, I mean, silence is, it doesn't say one way or the other. So I don't see how that helps you. Well, it's, it's inaccurate to say they all deny solicitation. First of all, that's an overstatement of the record. They do. You could look at it as half full or half empty is what you're saying. And they look at it one way and you look at it the other way. Well, I, maybe this is a semantical justice, but they were drafting presumably those affidavits and they knew how to say deny it in some 20 of the affidavits. And they did not include that in 11 of the affidavits. That is significant with respect to the something very briefly on the matter. And I, justice Hyman, I heard what you said earlier about your views on IU. I'm going to take one more stab to give you some additional information and a response to what some things, Mr. Filio said, he mentioned that Papan had handled the matter that was brought in by, by McNaball. And that's, that's correct. But he had been taken off that case. He had been taken off that case by McNaball and he knew he was heading out the door. And here we have a mediation that justice judge O'Connell was conducting the next day in which there was a 10 to $20 million bracket. When the parties walked out of that mediation the next day, there was a 10 to $20 million bracket that had been set at the mediation. So that was a very ripe piece of low-hanging fruit that Papan had available potentially to him. And Kogan and Power had no business relating to the firm to be talking to Papan. In fact, Power testifying, this is in our brief, that he had never talked to, this gets to your question earlier, justice Hyman, Power had never talked, recalled talking ever to Papan about any case at the firm. Yet here they are talking back and forth like a bunch of school kids the night before. And then the night of the they're doing the same thing again, a whole list of phone calls and texts that's all set forth in the record. There was motive and opportunity here to take the most valuable case in the firm and Papan knew he was out the door. And Kogan and Power, their story about not soliciting Power Papan to get this case just doesn't pass the smell test that Papan somehow miraculously shows up at their new doorway on the first day, actually during a holiday weekend, never solicited before and shows up with the Ayula case essentially in hand and they hire him on the spot. And they say there was no prior conversations, no solicitation. That's for a jury to decide. Their story is not credible, particularly in light of the lack of credibility that Mr. Power demonstrated by falsely testifying at the arbitration about his previous communications with Kogan about their departure. And then last point I'll raise that Mr. Filio mentioned. Oh, the alleged waiver of the corporate opportunity. Mosline was clearly raised as a solicitation in the court below that violated fiduciary duties. And the court was cited to Graham versus Mims and other corporate opportunity cases. Those were precisely the law that the court was cited to establishing the principle that solicitation of a potential opportunity is a breach of fiduciary duty. It was raised below. It was not waived. So for the reasons set forth in our brief and stated this afternoon, we ask that the court reverse and remand this case for your time and attention. Thank you very much. So any questions of Mr. Pelper? Thank you very much, gentlemen, for your very good oral arguments and for your excellent briefs. We've all read the record. We've read the case. We've read the briefs. We'll take this case under consideration. And for this afternoon, at least this case is adjourned. Thank you.